UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BUILDING INDUSTRY ELECTRICAL
CONTRACTORS ASSOCIATION and the
UNITED ELECTRICAL CONTRACTORS
ASSOCIATION,

                     Plaintiffs,

                                           10 Civ. 8002 (RPP)

           - against -

THE CITY OF NEW YORK and the             **OPINION AND ORDER**
BUILDING AND CONSTRUCTION TRADES
COUNCIL OF GREATER NEW YORK,

                     Defendants.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On December 13, 2010, Defendant the Building and Construction Trades Council

of Greater New York and Vicinity ("BCTC") moved to dismiss Plaintiffs' complaint in

its entirety pursuant to Rule 12(b)(6) and 12(b)(1) of the Federal Rules of Civil

Procedure.   On December 23, 2010, Defendant the City of New York similarly moved to

dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), or, in the alternative, for summary

judgment under Rule 56.   On March 4, 2011, Plaintiffs filed a joint brief in opposition to

these motions along with a motion to amend their complaint.   On April 15, 2011, the

Defendants filed reply briefs in support.   Oral argument was held on June 1, 2011.

## BACKGROUND

    I.    <u>The Parties</u>

      Plaintiff the Building Industry Electrical Contractors Association ("BIECA") is a

trade association of twenty-seven contractors, of which 16 perform publicly financed

projects for the city.   (Pls.' Mem. in Opp. at 2.)   "The object and purpose of BIECA is . . .

to further the interests of its members and those in any way related to the construction industry, to do anything necessary, suitable and proper, including the institution of legal proceedings, consistent with the public interest as well as the interest of this industry and trade, to bargain collectively for the members of this association and to strive to secure labor peace and tranquility in the construction industry."  (Id.)

BIECA, on behalf of its member contractors, has entered into a collective bargaining agreement ("CBA") with Local 363 United Electrical Workers of America, IUJAT ("Local 363").  (Id.)  The pertinent sections of the CBA between BIECA and Local 363 are:

1. Article I requires  BIECA and its contractors to recognize Local 363 as the "sole and exclusive bargaining representative of all of the electrical workers who are or may hereinafter become employed" by any BIECA contractor.

2. Article 2 requires all employees, who are employed by BIECA contractors, to become members of Local 363 by paying dues and initiation fees.

3. Article 25 requires all contractors that participate in the BIECA to contribute to the Building Trades Welfare Fund, Building Trades Annuity Fund, The Building Trades Educational Benefit Fund, and the Electrician's Retirement Fund (collectively the "Building Trades Funds"), as well as the United Service Workers Union Security Fund, on behalf of their employees who work on job classifications covered by the CBA.

(Id. at 2; Compl. ¶¶ 6-8.)

"Plaintiff United Electrical Contractors Association ("UECA") is a trade organization and not-for-profit corporation formed in 1965."  (Pls.' Mem. in Opp. at 2-3.) UECA currently consists of thirteen contractor-members, of which five perform publicly financed projects for the City of New York.  (Id. at 3.)  "The object and purpose of the UECA is . . . to further the interests of its members and those in any way related to the

construction industry, to do anything necessary, suitable and proper, including the institution of legal proceedings, for the accomplishment of its lawful objectives, and to bargain collectively for its members."  (Id.)

Since 1995, the UECA has been engaged in ongoing collective bargaining negotiations with Local Union No. 3, International Brotherhood of Electrical Workers ("Local 3").  (Id.)  Local 3 is a member of the BCTC.  (Id.)  To date, UECA and Local 3 have not successfully negotiated a CBA.  (Id.)  Pursuant to a December 7, 1995 Settlement Agreement with the National Labor Relations Board, UECA contractors are required to contribute to the Building Trades Funds on behalf of their eligible employees. (Id.)

Defendant BCTC is an umbrella organization of approximately fifty construction industry trade unions, representing over 100,000 New York City construction workers. (Affidavit of Gary LaBarbera ("LaBarbera Aff.") at ¶ 4.)  "The BCTC provides coordination and support to its affiliated local unions in order to achieve a unified effort on behalf of organized construction workers with respect to governmental affairs, improvement of working conditions, and community and economic development."  Id.

The BCTC's affiliates have CBAs with twenty-eight union contractor associations which represent approximately 1,700 construction managers, general contractors and trade contractors.  (Id. at ¶ 8.)

II.     The Project Labor Agreement ("PLA")

'Project labor agreement' shall mean a pre-hire collective bargaining agreement between a contractor and a bona fide building and construction trade labor organization establishing the labor organization as the collective bargaining representative for all persons who will perform work on a public work project, and which provides that only contractors and

subcontractors who sign a pre-negotiated agreement with the labor organization can perform project work.

N.Y. Labor Law § 222.

In 2008, the New York State Legislature passed New York Labor Law § 222. See Labor Law § 222. This law was passed as part of a 2008 reform package, and sought to reform section 101 of the General Municipal law (known as the "Wicks Law"). See Bill Jacket to Labor Law § 222, City's Mem. in Supp. at Appendix 2. The Wicks Law imposes a number of requirements for public projects, including that local governments prepare separate specifications for the electrical, plumbing and mechanical portions of the work. The Wicks Law requires four prime contractors to be involved in the construction or rehabilitation of a municipal project: electrical, plumbing, and mechanical contractors, as well as a general contractor. Pertinent to this litigation, New York Labor Law § 222 exempts from the coverage of Wicks Law all projects where a locality operates under a PLA.

On November 24, 2009, Mayor Michael R. Bloomberg, along with the president of the BCTC, publicly announced that the City and the BCTC had agreed to enter into three PLAs to be in force through 2014. (Declaration of Marla G. Simpson, ("Simpson Decl.") Ex. C.) These three PLAs are: (1) "Citywide Rehabilitation and Renovation of City Owned Structures," which applies to projects that predominantly involve the renovation, repair, alteration, rehabilitation or expansion of existing structures for designated City agencies on City-owned property within City limits (Simpson Decl., Ex. E); (2) "New Construction" for the Department and Design and Construction ("DDC"), which applies to eight new construction projects (Simpson Decl., Ex. H); and (3) "New

Construction" for the New York City Department of Sanitation ("DSNY"), which applies to three new construction projects.  (Simpson Decl., Ex. U.)

Subsequent to the November announcement, the City and the BCTC executed three additional PLAs:  (1) a Renovation and Rehabilitation PLA for the New York City Department of Environmental Protection ("DEP") (Simpson Decl., Ex. R); (2) a New Construction PLA for the Department of Parks and Recreation ("DPR") (Simpson Decl., Ex. Z); and (3) a Renovation and Rehabilitation PLA for the New York City Department of Housing Preservation & Development ("HPD"), which applies to the renovation, repair, alteration, rehabilitation or expansion of existing City-owned residential buildings that are part of the Tenant Interim Lease ("TIL") Program. (Simpson Decl., Ex. CC.)

Prior to entering into the PLAs with the BCTC, the City commissioned studies from four consultants to evaluate any potential cost savings and efficiencies that might result from the use of a PLA in conjunction with these projects.  (Simpson Decl. ¶ 13-16.) These consultancies included Hill International, the LiRo Group, the Turner Construction Company and Tishman Construction.  (Id. ¶ 13.)  The Director of the Mayor's Office of Contract Services ("MOCS"), together with a construction official from the relevant City agency, prepared a Report and Recommendation to each of the agencies executing the PLAs.  (Id. ¶ 14.)  "[E]ach study concludes that by obtaining certain union concessions, including standardizing work hours, overtime time hours, work shift rules and holidays for each of the various construction trades along with 'no strike' provisions and common grievance procedures, the City would realize substantial cost savings on projects covered by these PLAs."  (Pl.'s Mem. in Opp. at 9; see also Simpson Decl. ¶¶ 5-7 and 63-82.)

There are many similar provisions among the PLAs in question.  The most pertinent among these provisions are that the PLAs:  (1) provide for pre-hire recognition of the BCTC and its affiliates as the bargaining representatives of all construction workers working on PLA projects; (2) incorporate the affiliates' CBAs, including union security clauses; (3) require most contractors to secure a minimum of eighty-eight percent (88%) of their labor through the BCTC union referral systems; (4) prohibit unions from discriminating in referrals to the projects on the basis of union affiliation; (5) require contractors to contribute to the unions' fringe benefit funds on behalf of all workers in the bargaining unit; (6) provide for uniform work rules and standardized hours of work; and (7) include a broad no-strike clause and dispute resolution mechanisms for all job site disputes.  (LaBarbera Aff. at ¶ 28.)

The projects covered by PLAs are open to all successful bidders, union or non-union, so long as they agree to be bound by the terms and conditions of the PLA. (Compl. ¶ 23.)  Plaintiffs contend, however, that the PLAs favor the signatory contractors and impose conditions that make it cost-prohibitive for other contractors to bid on PLA covered projects.  (Pls.' Mem. in Opp. at 4.)

III.   Plaintiffs' Complaint

The Complaint alleges that the above listed provisions, among others, of the PLAs between the BCTC and the City effectively exclude the contractor-members of the UECA and the BIECA from the competitive bidding process for City construction projects. (Compl. ¶ 29.)  For example, Plaintiffs contend that the PLA's requirement that a contractor must draw 88% of its labor from the signatory BCTC trade union's hiring hall forces a non-BCTC contractor to work with a "stranger" workforce.  (Tuerck Aff. at ¶

6

25.)  Additionally, Plaintiffs assert that the PLAs require participant contractor unions to pay fringe benefits into BCTC union funds, resulting in a BIECA or UECA paying the same fringe benefits twice, once into the BCTC union funds and once into the Building Trades Funds.  This, Plaintiffs argue, renders it impossible for BIECA or UECA contractors to compete on price with BCTC signatory contractors.  (Compl. ¶ 33-34.) Moreover, Plaintiffs challenge the Letter of Assent provision, which requires each contractor awarded a bid under a City PLA to agree to be bound by the terms of the PLA and to certify that it has no other commitments or agreements that would preclude its full and complete compliance with the PLA.  (Compl. ¶¶ 30-31.)  This requirement, Plaintiffs argue, would preclude a contractor from bidding on PLA covered work to the extent that contractor has existing collective bargaining obligations.  (Id. ¶ 31-32.)  Specifically, Plaintiffs argue that the Letter of Assent requirement interferes with the existing CBAs between the BIECA contractors and Local 363, and the ongoing collective bargaining negotiations between UECA and Local 3.  (Id.)

Plaintiffs also contend that the cost savings that the City argues support the implementation of PLAs are illusory and speculative.  (Id. ¶ 40.)  The Complaint asserts that the feasibility studies carried out by the four consultancies are based on flawed methodology and on the erroneous assumption that only BCTC contractors would be employed on a particular City project whether or not the project was performed under a PLA.  (Id. ¶ 44.)  Plaintiffs argue that the studies prepared ignore the impact of the PLAs limiting the number of contractors that might participate in a competitive bidding process.  (Id. ¶ 46.)  Moreover, the Complaint alleges that the PLAs are not necessary for labor harmony, and that the PLA studies provide "scant evidence" that the types of

7

projects covered by the challenged PLAs have ever been subject to a strike or work stoppage.  (Id. ¶¶ 50; 54-57.)

Plaintiffs' Complaint asserts five causes of action.  First, it asserts that the PLAs are preempted pursuant to the National Labor Relations Act, 29 U.S.C. §§ 151-169 ("NLRA").  Second, it asserts a cause of action under 42 U.S.C. § 1983 for interference with Plaintiffs' right, guaranteed by the NLRA, to bargain collectively free of government interference.  Third, the Complaint requests declaratory judgment setting forth the "rights duties and responsibilities of the Plaintiffs and Defendants arising from the City's mandate of five (5) unlawful PLAs covering present and future public construction projects."  Fourth, Plaintiffs bring a state law claim asserting that the PLAs violate General Municipal Law § 103(1), which provides that "all contracts for public work involving an expenditure of more than thirty-five thousand dollars. . . shall be awarded. . . to the lowest responsible bidder furnishing the required security after advertisement for sealed bids in the manner provided for in this section."  Gen. Munic. Law § 103(1).  Finally, the Complaint asserts a state law claim for violation of New York Labor Law § 222, which provides in pertinent part that a municipality may require a PLA where it "determines that its interest in obtaining the best work at the lowest possible price, preventing favoritism, fraud and corruption, and other considerations such as the impact of delay, the possibility of cost savings advantages and any local history of labor unrest, are best met by requiring a project labor agreement."  Labor Law § 222.  Plaintiffs contend that the City has violated Section 222 by enacting overbroad PLAs and not determining the need for a PLA on a case by case basis.

IV.    Defendants' Motions to Dismiss or Alternatively for Summary Judgment

Defendants the City of New York and the BCTC filed separate motions to dismiss or alternatively for summary judgment, raising overlapping arguments.

The City contends that Plaintiffs' preemption claim must fail because the Supreme Court, in Building & Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218 (1993) ("Boston Harbor"), held that the use of PLAs by local governments was not preempted by the NLRA where the PLAs were used in conjunction with proprietary, rather than regulatory conduct on the part of the municipality.  Second, the City argues that the Court lacks subject matter jurisdiction with regard to Plaintiffs' claims originating under state law, and that even if the Court could exercise supplemental jurisdiction over those claims, it should decline to do so.  Finally, the City contends that its determination to require PLAs  comported with § 222 and New York's public bidding laws because it was rationally based and supported by expert studies on the PLAs concluding that each of the PLAs would result in substantial savings.

Defendant BCTC moves for dismissal first on the same ground asserted by the City; that following Boston Harbor, PLAs are not preempted by the NLRA under the "market participant" doctrine.  Second, BCTC asserts that Plaintiffs do not have standing to assert claims under 42 U.S.C. § 1983, and that even if they do, BCTC as a private entity is not a state actor subject to suit under § 1983.  BCTC also claims that the interests Plaintiffs' characterize as liberty interests, which underlie the § 1983 claim, are not properly characterized as such.  BCTC further contends that the PLAs are lawful under New York's competitive bidding laws, because they protect the public fisc and prevent

fraud, favoritism and corruption.  BCTC also argues that the PLAs do not violate Labor Law § 222 because the City properly determined that a PLA requirement would be in the public interest.  Finally, BCTC argues that the Court should dismiss the state law claims in the event Plaintiffs' federal claims are dismissed because the Court lacks supplemental jurisdiction over those state law claims.

In response, Plaintiffs contend that the PLAs are preempted by the NLRA, despite the <u>Boston Harbor</u> ruling, because here the City is acting as a regulator, rather than as a proprietor.  Plaintiffs contend that they have standing to pursue their § 1983 claim because their activities have been "perceptibly impaired" by the diversion of their resources to fighting the City's practice of employing PLAs.  Plaintiffs also argue that the BCTC has acted under color of state law such that it is subject to suit under § 1983.  Next, Plaintiffs assert that the Court should exercise supplemental jurisdiction over the Complaint's state law claims because they derive from a common nucleus of fact and law as the federal claims.  Plaintiffs then argue that Defendants have violated New York's public bidding laws because they have not demonstrated more than a rational basis for implementing the PLAs.  Finally Plaintiffs move for leave to amend the Complaint to include further evidence that their activities have been perceptibly impaired and therefore they have standing to pursue their claims under § 1983 and to add a PLA that was executed by the City and the BCTC after the Complaint was filed.

For the reasons discussed below, Defendants' motions to dismiss are granted.

**DISCUSSION**

I.      Standards on a Motion to Dismiss

The "standards for dismissal under [Rule] 12(b)(6) and 12(b)(1) are substantively identical." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003). In order to survive a 12(b)(6) motion to dismiss, Plaintiffs must have alleged "enough facts to state a claim to relief that is plausible on its face." Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)). The court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. Ruotolo, 514 F.3d at 188. Consideration of a Rule 12(b)(6) motion is limited to the factual allegations in the complaint and documents either attached to or incorporated by reference in the complaint. Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 392-23 (S.D.N.Y. 2010) (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)). The PLAs themselves and the consultant studies related to them were incorporated by reference in Plaintiffs' complaint, and are thus considered by the court on this motion. See Cortec. Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991).

The 12(b)(1) motion to dismiss for lack of subject matter jurisdiction challenges the district court's statutory or constitutional power to hear Plaintiffs' state law claims. "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000).

II.     Preemption Under the NLRA

Plaintiffs claim that the PLAs in question are preempted by the NLRA because they interfere with certain rights that the NLRA protects.  (Compl. ¶ 73-74.)  These rights include the right to be free from government interference in the collective bargaining process regarding wages, hours and other terms or conditions of employment.  (Id. ¶ 74.) Plaintiffs contend that the PLAs unlawfully interfere with these rights because they preclude Plaintiffs from bidding on covered contracts and interfere with Plaintiffs right to bargain collectively with member unions and potential member unions.  (Id. ¶ 76-77.) Defendants argue that this claim should be dismissed because, under the Supreme Court's decision in Boston Harbor, PLAs between government entities and contractors are not preempted by the NLRA where the government entity is acting a proprietor rather than a regulator.  (BCTC's Mem. in Supp. at 8; City's Mem. in Supp. at 8.)

A.  The Boston Harbor Decision

Boston Harbor addressed the issue of whether the NLRA preempts "a state authority, acting as the owner for a construction project," from enforcing an otherwise lawful prehire collective bargaining agreement negotiated by private parties.  Id. at 220. The case arose out of the cleanup of Boston Harbor, a project that was commenced as a result of a court order demanding that the cleanup project proceed expeditiously and without interruption.  Id. at 221.  The project was expected to cost $6.1 billion and take ten years.  Id.  The Massachusetts Water Resources Authority ("MWRA") had primary authority over the project, and selected Kaiser Engineers to serve as project manager.  Id. Kaiser suggested to MWRA that they be permitted to negotiate a PLA with the Building and Construction Trades Council and its affiliated organizations that would assure labor

stability over the life of the projects.  Kaiser then negotiated such a PLA with the BCTC which provided for:  1) recognition of the BCTC as the exclusive bargaining agent for all craft employees; 2) use of specified methods for resolving all labor-related disputes; 3) a requirement that all employees be subject to union-security provisions compelling them to become union members within seven days of their employment; 4) the primary use of BCTC hiring halls to supply the project's craft labor force; 5) a ten-year no strike commitment; and 6) a requirement that all contractors and subcontractors agree to be bound by the agreement.  Id. at 221-222.

At the outset of the Boston Harbor opinion, the Court reviewed two distinct NLRA preemption principles.  Id. at 224.  The first, Garmon preemption, see San Diego Building Trades Council v. Garmon, 359 U.S. 236, (1959), prohibits state and local regulation of activities protected by § 7 of the NLRA, or that constitute an unfair labor practice under § 8.  Boston Harbor, 507 U.S. at 224-225.  The Garmon court held that the state court was precluded from awarding damages to employers for economic injuries resulting from peaceful picketing by labor unions.  Id. at 225.  "[T]he Garmon rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act."  Id.

A second NLRA preemption principle was established by the Supreme Court in Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n, 427 U.S. 132 (1976) ("Machinists").  Machinists stands for the principle that state and local governments are prohibited from regulating areas that the NLRA leaves to "be controlled by the play of economic forces."  Id. at 140.  In

Machinists the Court held that "the Wisconsin Employment Relations Commission could not designate as an unfair labor practice under state law a concerted refusal by a union and its members to work overtime, because Congress did not mean such self-help activity to be regulable by the States." Boston Harbor, 507 U.S. at 226.

The Court in Boston Harbor then held that each of the two preemption doctrines applies only to regulatory conduct:

> When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see Machinists, or for NLRB jurisdiction, see Garmon. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state regulation.

> Id. at 226-227.

The Court distinguished proprietary activity from the type of activity it had found to be objectionable in Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc., 475 U.S. 282 (1986).  In Gould, the Court explained, the conduct was regulatory because "the statute at issue in Gould addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations, we concluded: 'Wisconsin 'simply is not functioning as a private purchaser of services.''" Boston Harbor, 507 U.S. at 228-229.  The Gould Court also noted that it was "not say[ing] that state purchasing decisions may never be influenced by labor considerations." 475 U.S. at 291.

The Boston Harbor Court then noted certain 1959 amendments to §§ 8(e) and 8(f) of the NLRA.  Id. at 230.  "Section 8(f) explicitly permits employers in the construction

industry-but no other employers-to enter into prehire agreements." Id.  Furthermore, "[t]he 1959 amendment adding a proviso to subsection (e) permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement." Id.  The Court explained that "[i]t is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry." Id. at 231.  These conditions included the short-term nature of employment, the contractor's need for steady labor supply and predictable costs, and the longstanding practice of prehire bargaining.  Id.

The Boston Harbor Court then turned to whether the PLAs entered into by Kaiser on behalf of the MWRA represented regulation by the state, and found that they did not, and thus that they were not preempted by the NLRA.  The Court reviewed the PLAs at issue, and found that MWRA was acting as a proprietor, because it was "attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." Id. at 232.  The Court noted that the "challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project. There is therefore no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry." Id.  It concluded that "when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not

'regulate' the workings of the market forces that Congress expected to find; it exemplifies them."  Id. at 233.

B.  The Market Participant Doctrine

If the City was acting as a market participant in executing the PLAs, rather than as a regulator, the PLAs are not preempted by the NLRA.  Boston Harbor, 507 U.S. 229. See also Healthcare Ass'n of New York State v. Pataki, 471 F.3d 87, 108-09 (2d Cir. 2006) ("A major limitation on the labor law preemption doctrines is the principle that state conduct will not be preempted if the state's actions are proprietary, rather than regulatory.")

To determine whether a state entity's actions can be considered those of a market participant, this Circuit has applied the Fifth Circuit's test, formulated in the case Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir. 1999).  See Sprint Spectrum L.P. v. Mils, 283 F.3d 404, 420 (2d Cir. 2002).  Cardinal Towing considered a Texas city's choice to contract with a single towing company for involuntary tows carried out by its police department rather than rotate through a selection of local towing companies.  There the court held that:

> [i]n distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power, the key under Boston Harbor is to focus on two questions.  First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

180 F.3d at 93.

16

The Cardinal Towing court explained that both questions seek to identify those government actions that are narrowly focused and in line with the behavior of private parties making similar proprietary decisions that there can be no inference of a regulatory motive.  Id.  The parties dispute whether both of these questions must be answered in the affirmative in order for the government action to be considered proprietary.  The Defendants point to Johnson v. Ranch Santiago Cmty. College Dist., 623 F.3d 1011, 1024-25 (9th Cir. 2010), which interpreted the two questions in the Cardinal Towing test as disjunctive, offering two alternative methods of showing that a given state action constituted non-regulatory market participation.  Under Rancho Santiago's interpretation, the first question asks the government entity to show that its activity was proprietary in nature by showing its motivations to be rooted in a desire for efficiencies and cost-savings, and by comparing its conduct to that of a private party.  Id. at 1024.  The second question requires a showing that the entity's action was narrow in scope and therefore not regulatory.  Id.  The Rancho Santiago court then stated "we see no reason to require a state to show both that its action is proprietary and that the action is not regulatory."  Id.

The test established in Cardinal Towing is not formulated as a list of mandatory elements, each of which must be established for the challenged state action to be classified as proprietary.  Instead, the court described the test as two "key questions" to be asked in making this determination.  As the Ninth Circuit ruled in Rancho Santiago, the test provides two alternative routes to arrive at the same destination; either the activity is essentially proprietary due to its apparent motives and similarity with actions generally taken by a similarly situated private party, or it is so narrowly circumscribed as to not amount to regulation.  623 F.3d at 1024. Boston Harbor provides that "[a] State may act

without offending [the NLRA preemption principles] when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking." 507 U.S. 218, 229. This is the standard that the Defendants must meet. While each of the Cardinal Towing questions are useful tools in determining whether a challenged state action is proprietary or regulatory, an affirmative answer to both questions is not what Boston Harbor requires.

   C.   The City's Act of Entering into PLAs with the BCTC Was Proprietary and Is Not Preempted by the NLRA

Here, Plaintiffs argue that Defendants failed to meet either of the Cardinal Towing prongs, because they have not shown that the PLAs will achieve substantial cost savings and therefore they cannot show that their conduct compares to that of a private land owner. (Pls.' Mem. in Opp. at 26.) Plaintiffs also argue that the PLAs are overbroad and therefore not so narrowly tailored as to defeat an inference of regulatory intent. (Id. at 26-28.) The Defendants counter that the PLAs meet both prongs, because the City's decision to enter into the PLAs was motivated by an interest in cost savings and efficiency, and because the PLAs only relate to certain contracts with the City, and are not directed beyond the City's own projects. (BCTC's Mem. in Supp. at 10-11; City's Mem. in Supp. at 14-15.)

        i.   The City Was Motivated by Proprietary Interests

The first Cardinal Towing question asks whether the City is motivated by its interest in the efficient procurement of goods and services. In support of their motion, Defendants contend that each of the studies undertaken by consultants hired by the City show that the PLAs would be likely to result in substantial cost savings and additional efficiencies generated by a package of negotiated work rules. (City's Mem. in Supp. at

18

14.)  Plaintiffs challenge that conclusion, arguing that the studies were flawed, because the use of PLAs artificially reduces the bidding pool and thus increases construction costs.  (Pls.' Mem. in Opp. at 26-27.)

Plaintiffs have failed to show that the City's decision to engage in these PLAs with BCTC was motivated by anything other than its interest in managing its construction projects in an efficient manner and at a manageable cost.  As discussed earlier, New York Labor Law § 222 exempts those projects that operate pursuant to a PLA from the requirements of the Wicks Law.  N.Y. Labor Law § 222.  Wicks Law requires the City to employ multiple contractors to oversee certain components of a shared project, logically resulting in inefficiencies.  Gen. Municipal Law § 101.  The City's consultants concluded that the exemption from these requirements alone will reduce the costs of these projects.  (Simpson Decl. ¶ 15 (summarizing consultant findings).)  Additionally, the PLAs permitted the City and the BCTC to agree on generally applicable terms of work that will govern these projects, such as a standardized work week, standard holidays, flexible start times, and coordinated lunch periods.  (Id. ¶¶ 47-62 (citing to the relevant PLA sections.))  The PLAs also provide for a cap on overtime.  (Id.)  In addition, the PLAs prohibit strikes and provide for a uniform jurisdictional disputes resolution procedure.  (Id.)  These uniform work procedures and dispute resolution vehicles are clearly targeted at increasing efficiency and coordination and reducing expense.  These provisions clarify responsibility, minimize administrative difficulties and encourage continuous progress.

These are the exact types of considerations that Cardinal Towing considered to be indicia of proprietary action.   See 180 F.3d at 693 (finding that a towing contract aimed at easing supervision, minimizing administrative confusion and providing for a unitary

quality standard indicated that the City was interested in ensuring efficient performance of the contract).  The terms of the PLA lead ineluctably to the conclusion that the City was motivated by efficient, cost-effective and timely completion of their work, and Plaintiffs point to no credible alternative purpose underlying the City's actions.[1]  While Plaintiffs contend that the cost-savings and efficiencies the PLAs are projected to provide are illusory, "whether the [PLA] was a good deal for the [City] does not bear on whether the Agreement is regulatory or proprietary."  Rancho Santiago, 623 F.3d at 1027.   The PLAs on their face are targeted at increasing efficiencies and reducing costs, and "private parties undertaking large construction projects commonly enter into pre-hire project labor agreements like the [PLA] challenged here."  Id. at 1026.  There has been no showing that the City was motivated by any interest other than a proprietor's interest in having his project completed in a timely and inexpensive fashion.

ii.     The Breadth of the PLAs Does Not Render Them Regulation

Plaintiffs next contend that the PLAs should be seen as regulatory and not proprietary action because they are overbroad.  In contrast to the PLA at issue in Boston Harbor, the PLAs here are directed at a number of projects and a "broad spectrum of work."  (Pls.' Mem. in Opp. at 28-29.)  Plaintiffs contend that this breadth results in an inference that the City is acting not only as a proprietor, but also with regulatory intent in executing these PLAs.

---

[1] Moreover, several courts have held that any hidden, subjective reasons that may underlie the City's decision to employ PLAs do not weigh into the preemption analysis.  See Colfax Corp. v. Illinois State Toll Highway Auth., 79 F.3d 631, 635 (7th Cir. 1996) ("So long as the frontier is pushed no farther from "Boston Harbor" than it is here, we will not travel where Colfax urges; we will not go behind the contract to determine whether the Authority's real, but secret, motive was to regulate labor."); Johnson v. Rancho Santiago Cmty. College Dist., 623 F.3d 1011, 1026 (9th Cir. 2010) ("Congress did not intend for the NLRA's . . . preemptive scope to turn on state officials' subjective reasons for adopting a regulation or agreement.").

The Boston Harbor Court referred to the fact that the PLAs at issue in that case pertained to a single project as support for its conclusion that "[t]here is. . . no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry, incentives that this Court has recognized as legitimate."  507 U.S. at 232.  A comparison with Cardinal Towing, however, makes clear why the PLAs at issue here are not preempted despite the fact that they cover more than one project.

In Cardinal Towing, the defendant, the City of Bedford, altered their procedure for hiring towing companies to tow vehicles abandoned or damaged by accidents.  180 F.3d 688.  Historically, these tows were handled by a rotation system pursuant to which local towing companies would apply and be placed on a list, and when the City needed to tow a vehicle, they would call whichever company's "turn" it was at the time that tow was needed.  Id. at 689.  The City changed this practice in favor of hiring one towing company to handle all such tows.  Id.  This company was selected based on certain identified criteria after a bidding process.  Id.

The Court held that the scope of this contract did not subject it to preemption by the NLRA, in part because "as in Boston Harbor—but unlike Gould—the specifications here looked only to the bidder's dealings *with the City*."  Id. at 694 (emphasis original). The contract did not affect the conduct of tow truck providers in their dealings with other customers within the City of Bedford, foreclosing the inference that "the City sought to change the tow truck industry as a whole, let alone influence society at large."  Id. Similarly, in Rancho Sanitago, the Ninth Circuit applied the Cardinal Towing test and held that a PLA that applied to all covered projects in excess of $200,000 and ran for several years was not preempted by the NLRA, in part because "nothing on the face of

21

the [PLA] indicates that it serves purely regulatory purposes unrelated to the performance

of contractual obligations to the state. The [PLA] does not reward or sanction private

parties for their conduct in the private market, but rather addresses only how construction

contractors and subcontractors will perform work on the District's projects."  623 F.3d

1011 at 1026.  See also Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty., 431

F.3d 277, 270 (7th Cir. 2005) ("if the state is intervening in the labor relations just of

firms from which it buys services, and it is doing so in order to reduce the cost or

increase the quality of those services rather than to displace the authority of the National

Labor Relations Act and the National Labor Relations Board, there is no preemption.").

     The Rancho Santiago court noted that the substantive scope of the PLA

challenged in that case was:

> very similar to the Boston Harbor agreement's. Like the District's [PLA],
> the Boston Harbor agreement recognized one exclusive bargaining agent,
> specified dispute-resolution mechanisms, required all employees to
> become union members within seven days of their employment, required
> use of the union's hiring halls to supply the labor force, prohibited strikes
> for the term of the agreement, bound all contractors and subcontractors to
> the agreement, and prescribed the benefits that workers would receive for
> the duration of the project.

Id. at 1028.

     The PLAs at issue in this case share many of the same provisions of the PLAs

challenged in Boston Harbor and Rancho Santiago.  Indeed, they are nearly

indistinguishable from the Boston Harbor PLAs except for the fact that they cover

multiple projects.  Even this distinction might not be of great importance, however, in

view of the fact that the Boston Harbor cleanup project spanned a decade and involved

hundreds of contractors, and was thus an enormous "single" project with many

components.  507 U.S. at 221.  Like the PLAs at issue in Cardinal Towing and Metro.

Milwaukee, the challenged PLAs also apply exclusively to the projects that BCTC will perform on behalf of the City.  They do not extend to govern conduct by the BCTC or other private parties in the construction industry on behalf of private clients, like the preempted PLAs in Gould.  Therefore, these PLAs are not preempted by the NLRA.

    D.  42 U.S.C. § 1983

Plaintiffs also asserted a claim pursuant to 42 U.S.C. § 1983, alleging that the City and the BCTC violated Plaintiffs' federally-guaranteed right under the NLRA to bargain collectively, free from governmental interference.

"To succeed on a claim asserted under 42 U.S.C. § 1983, a party must prove that he or she was deprived of a right secured by the Constitution or by the laws of the United States and that the person or persons depriving the party of the right acted under color of state law."  Ruggiero v. Krzeminski, 928 F.2d 558, 562 (2d Cir. 1991).  "In order to seek redress through § 1983 ..., a plaintiff must assert the violation of a federal right, not merely a violation of federal law."  Blessing v. Freestone, 520 U.S. 329, 340 (1999). Here, having found that the PLAs at issue are not preempted by the NLRA, it follows that "there is no violation of federal law," and thus no violation of a federal right secured by the NLRA, "to form the basis for a claim pursuant to § 1983," Colfax Corp. v. Illinois State Toll Highway Auth., 79 F.3d 631, 635 (7th Cir. 1996).

    III.    State Supplemental Law Claims

Both BCTC and the City urge this Court to dismiss Plaintiffs' state law claims for lack of subject matter jurisdiction once the federal claims are dismissed.  Both Defendants claim that the state law claims fall within the ambit of C.P.L.R. Article 78, which provides a special remedy under New York state law to review administrative

23

determinations, and that therefore federal jurisdiction would be inappropriate.  (City's Mem. in Supp. at 17; BCTC's Mem. in Supp. at 24-25.)  The City also argues that this Court should decline supplemental jurisdiction over the state law claims at issue because they involve novel questions of state law.  (City's Mem. in Supp. at 19.)  In the alternative, Defendants argue that the PLAs are lawful under New York's competitive bidding laws.  (City's Mem. in Supp. at 20-25; BCTC's Mem. in Supp. at 17-24.)

Plaintiffs urge the Court to exercise supplemental jurisdiction over the state law claims because the evidence underlying the state law claims is the same as that underlying their federal claims.  (Pls.' Mem. in Opp. at 34.)

A.  Law Governing Supplemental Jurisdiction

Under 28 U.S.C. § 1367, "in any civil action of which the district courts have original jurisdiction the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy."  A claim is "so related" to those claims within the court's original jurisdiction when the claims "derive from a common nucleus of operative fact, such that a party "would ordinarily be expected to try them all in one judicial proceeding."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (citations omitted).   The district courts may decline to exercise supplemental jurisdiction, however, if the district court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).

"Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' Cohill, 484 U.S. at 350, in deciding whether to exercise jurisdiction."  Kolari v. New York-

Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n. 7.

      B.   Article 78 Proceedings Under New York Law

New York's Civil Practice Law and Rules ("CPLR") Article 78 provides a specific and exclusive remedy where a question raised by a party goes to "whether a determination was made in violation of lawful procedure, was affected by error of law or was arbitrary or capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed."  CPLR § 7803(3).  To determine whether Article 78 applies to a given dispute, a reviewing court must "examine the substance of the action to identify the relationship out of which the claim arises and the relief sought."  Solnick v. Whelan, 49 N.Y.2d 224, 229 (1980).  An Article 78 proceeding is the proper vehicle to determine whether the law has been lawfully applied, or the validity of certain government acts pursuant to a valid statute, rather than a vehicle for challenging the validity of a statute itself.  Rosenthal v. City of New York, 283 A.D.2d 156, 158 (1st Dep't 2001); Kovarsky v. Housing and Development Admin., 31 N.Y.2d 184, 191 (1972).

Proceedings under Article 78 can only be heard in the State Supreme Court. CPLR § 7804(b).  A number of district courts have dismissed cases brought in federal court that should have been brought to State Supreme Court as an Article 78 proceeding. See Brown v. Tomcat Elec. Sec., Inc., No. 03 CV 5175 (FB), 2007 WL 2461823 at *3 (E.D.N.Y. Aug. 27, 2007) ("New York law vests jurisdiction over Article 78 proceedings

solely in the state courts"); <u>Blatch v. Hernandez</u>, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005) ("This claim must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims."); <u>Cartegena v. City of New York</u>, 257 F. Supp.2d 708, 710 (S.D.N.Y. 2003) ("State law does not permit Article 78 proceedings to be brought in federal court, and hence I conclude that I do not have the power to exercise supplemental jurisdiction over [plaintiff's] Article 78 claims."); <u>see also</u> <u>Camacho v. Brandon</u>, 56 F. Supp. 2d 370, 380 (S.D.N.Y. 1999); <u>Luchesi v. Carboni</u>, 22 F. Supp. 2d 256, 258 (S.D.N.Y. 1998).

As pled in their Complaint, Plaintiffs' state law claims challenge the City's decision to enter into the PLAs, arguing that this choice was not "supported by the record or [] sufficiently tailored to a specific project in order to advance the interests embodied in the competitive bidding statutes." (Compl. ¶ 102.) Furthermore, Plaintiffs allege that Defendants:

> have failed to identify any unique challenges posed by the size or complexity of the projects covered by the City PLAs, failed to demonstrate actual rather than illusory cost savings, and have failed to identify any history of labor unrest on similar projects to support the conclusion that the City PLAs were adopted in conformity with the competitive bidding scheme.

(Compl. ¶ 103.)

Moreover, Plaintiffs argue that the PLAs specifically violate Labor Law § 222 because the City enacted "blanket PLAs not limited to a specific project and [failed] to determine the need for a PLA on a project-by-project basis." (Comp. ¶ 107.)

Plaintiffs' state law claims are challenges to the City's actions in view of valid governing New York law. They amount to an assertion that the City's choice to execute

the PLAs was unlawful or at best arbitrary and capricious.  Thus, they are recast Article

78 claims that are not suitable for adjudication in this Court.

Plaintiffs cite several cases from this Circuit's courts holding that Article 78

claims could be adjudicated by federal courts pursuant to supplemental jurisdiction.

James v. Bauet, No. 09 Civ. 609 (PKC), 2009 WL 3817458 at *2 (S.D.N.Y. Nov. 11,

2009) ("None of the cases cited by the City Defendants hold that a federal court is

stripped of its jurisdiction to hear federal question cases because plaintiff may have been

able to file a parallel Article 78 proceeding in New York state court."); Acista v. City of

New York, No. 03 Civ. 1452 (TPG), 2004 WL 691270 at *4-5 (S.D.N.Y. March 31,

2004).

The cases cited by Plaintiffs involved viable federal claims and state law claims

that were characterized as arising under Article 78.  Here, due to this Court's dismissal of

Plaintiff's federal law claims, the state law claims are all that remain.  Balancing the

traditional 'values of judicial economy, convenience, fairness, and comity,' Cohill, 484

U.S. at 350, this Court declines to retain supplemental jurisdiction over Plaintiffs' state

law claims.  The New York State legislature has devised Article 78 as an exclusive

remedy to resolve challenges to the lawfulness of administrative action.  "State law does

not permit Article 78 proceedings to be brought in federal court," Cartagena, 257 F.

Supp. 2d at 710, and so Plaintiffs' state law claims are dismissed.

IV.    Plaintiffs' Motion to Amend

Simultaneously with their Memorandum in Opposition, Plaintiffs moved to

amend their complaint, in order to include "(1) additional allegations that BIECA and

UECA have been perceptibly impaired and therefore have the requisite standing to pursue

27

their claims under §1983; (2) the HPD PLA, which was executed by the City and BCTC after Plaintiffs filed their Complaint; and (3) any future and all future PLAs that may be adopted by the City in violation of Plaintiffs' rights under Federal and New York State Law."  (Pls.' Mem. in Opp. at 44-46.)

Leave to amend a complaint should be granted so long as the proposed amended pleading demonstrates at least "colorable grounds for relief."  Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 783 (2d Cir. 1984).  In light of the Court's rulings in this Opinion, namely that the City's conduct in executing the PLAs in question was proprietary rather than regulatory and that Plaintiffs' claims are thus dismissed, these proposed amendments do not make out a colorable claim for relief. Plaintiffs' motion to amend is therefore denied.

## CONCLUSION

As in Boston Harbor, the PLAs at issue in this case represent proprietary rather than regulatory conduct by the City and are therefore not preempted by the NLRA.  507 U.S. 218.  The City has not violated the NLRA by executing these PLAs, and therefore Plaintiffs' § 1983 claim has no basis.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, because they are challenges to municipal conduct that fall within the purview of N.Y. C.P.L.R. Article 78, and thus are more appropriately heard in state court.  Plaintiffs' motion to amend is denied.

IT IS SO ORDERED.

Dated:  New York, New York
       August _4_, 2011

                                Robert P. Patterson, Jr.

                                       U.S.D.J.

Copies of this opinion were faxed to:

Attorneys for Plaintiffs:

Alan Marshall Pollack
Robinson Brog Leinwand Greene Genovese & Gluck PC
875 Third Avenue
9th Floor
New York, NY 10022-6225
212 603-6300
Fax: 212 956-2164

Attorney for Defendant:

Jonathan Starr Becker
Office of The Corporation Counsel
100 Church Street
New York, NY 10007
(212)-788-1280
Fax: (212)-788-3783

Carol L. O'Rourke Pennington
Colleran, O'hara & Mills LLP
1225 Franklin Avenue, Suite 450
Garden City, NY 11530
(516)-248-5757
Fax: (516)-742-1765